Thank you on behalf of Mr. Castro. This case revolves around the enhancements of the firearm enhancement and maintaining a premises enhancement at its sentencing. The first thing I do want to bring to the court's attention, as far as the record goes, there was a statement made by Mr. Castro's lawyer that the magazine to the firearm was found in a drawer. It has come to my attention that it was actually found in the gun case, but it was not loaded and there was no ammunition. But we wanted to make sure we brought that to the court's attention. Yes, thank you for that. And credit to Mr. Anderson for bringing it to my attention so we could do that. So I first want to start off with the firearm enhancement. And I think some of these arguments kind of dovetail with each other, but the facts are pretty consistent and agreed upon. The main issue with the firearm is the firearm was located in a closet. There was a magazine adjacent to it, but it was not in the firearm. And there was no ammunition found in the apartment in any way, shape, or form. And I think that is critical to the court's analysis of whether or not it was clearly improbable it was connected to the office. I thought we had cases saying it doesn't matter if there's no ammunition. That is true, but I think when you take that fact along with the fact that there's no drug transactions connected to the apartment, I think is critical. And I think they work together. But a billion dollars in proceeds and $250,000 in jewelry and proceeds, that's stipulated as well. Yes, that is stipulated as well. But I think the way we have looked at it is that when you look at the enhancement for the premises as well as the firearm, there's no drug transactions associated with that house. There's no drugs found there. There's no drugs paraphernalia found there. But the fear is that if you have drug proceeds and a weapon near it, that the likelihood is that weapon will be at least brandished if not used. And conflict can arise when weapons are near drug proceeds. I understand that. I think what the record, though, that's developed in this case I think is really important is because— So give me a carve out that will protect all those interests. Well, I think there's a couple things when you look at it. One is, in this particular case, there was a lot of surveillance done of Mr. Castro. And they filed him for various locations. It's a multi-defendant case. And there's no evidence that in any of the drug transactions that he personally, where he delivered kilos of cocaine, that there's any evidence he possessed or carried a firearm during those drug transactions. We agree that the money in the house is proceeds. But the fact that it's unloaded and that there's no ammunition at the house I think is important. I think the application note that talks about that if it's an unloaded hunting rifle, that wouldn't apply. I think whether it's a hunting rifle or a firearm, I think the operative fact that we will ask the court to focus on is the fact that it's unloaded and there's no ammunition. It's not just because there's a firearm in a closed case near drug proceeds. I think those are the operative facts that show it's not probable it's connected to the offense. Because it's not at the ready. It's not in a nightstand. It's not in a holster. It's not loaded. There's no magazine in it ready to go. The person would have to physically open the case, insert the magazine, but then before that even find ammunition to do that. So I think with those operative facts and that there's no evidence or admissions that I carried the firearm with me during the drug transactions, delivering cocaine or receiving proceeds, that therefore the enhancement should not apply. Well, you walk into your stash house for your proceeds. You have a magazine in your pocket. You clip it in your gun and you're ready to go and you're going to guard your proceeds. I'm having a hard time. You were asking us to carve out a special thing for this case, it sounds like, and I don't see how we can protect all the interest, as I said, that the cases have identified. But I think that in reviewing those cases, I think those cases also have proceeds with drugs attached to them. There's drugs located in the house. There's drugs paraphernalia in the house, and so they were part and parcel of that. I have not seen any necessarily cases where there's just solely proceeds and not drugs. There's always been drugs associated, whether it's in the storage shed, whether it's in the car, whether it's in the nightstand or in the kitchen. There's drugs with the proceeds, and I think that also ties into the— So I don't think we're asking to carve out an exception. I think what we're asking the court to do is, based on the facts that are presented in the record, is it clearly improbable that it was associated with the offense? And I think when you have the facts of it's in a gun case with no ammunition on a shelf in a closet, that those operative facts, that he never carried a firearm, he never had a dispossession during any drug transactions, those operative facts don't support the enhancement. So we're not asking for a carve-out. I think based on the current state of the law and the facts in this case, that it was improperly applied. And so I think all those taken together support that position when we look at all the other cases that say it can be improperly applied. So that's our view on it, I think, but it also goes into the premises issue, maintaining the premises, because the facts in the case show that there's no drug transactions or distribution from the apartment. But there's no indication of any other use that that premises would have been used for. In other words, no indication of some other people living there or that sort of thing. Well, there was indication that some people, Mr. Castro was living there because there were clothes found in the closet. And so there were clothes there that would indicate someone could live there. But I agree that it wasn't like a standard residence in that sense, that somebody was living there full time. But there was an issue that Mr. Castro had clothes in the closet as there as well. Now, I think the other thing, too, that makes this case different in that there's no drugs found in the house is the level of surveillance that was occurred in the case. And I think one of the things that kind of stuck out to me is in the PSR, on page 278 of the record, it's paragraph 16 that they indicated that they had used GPS location data from Mr. Castro's phone. And I think that's critical because in all the transactions that occurred, you see Mr. Castro arriving at locations and delivering cocaine and coming back with proceeds, that there's nothing in the GPS data that connects the picking up of cocaine from that location. And I think with the amount of surveillance and the lack of evidence in there, it doesn't support the premises enhancement. And I think what's important about that is the guideline application, though, talks about the manufacturing and distribution of a controlled substance from that location. And they did not include drug proceeds. So I think that's critical that there's no evidence in the record that there's any manufactured distribution of controlled substance, in this case cocaine, from that apartment to support the premises enhancement in that case. So I think that's important. And I think also the other point I'd like to make is that it seemed to be a focus of the court and the government in sentencing that Mr. Castro signed a factual resume that he engaged in drug trafficking activities. And it seemed to be used as the basis to support those enhancements. We would point to the Lee case that basically stood for the proposition that we cite in our reply brief, that that statement in a factual resume is insufficient by itself to support that conclusion. So I think that is a critical fact that it's just based on a statement in a factual resume. He never states, I use that apartment to transport drugs, store drugs, pick up drugs. There's none of that. None of those statements in the record, which in some other cases the courts have found, because they made statements, I use the apartment for drug trafficking and store drugs there. That was sufficient. But we don't have that in this case. It's just simply a statement that was part of his drug trafficking activities. And so I think that's important in the case for the court to look at. Would you please speak up? I can't hear you. And I think that's important for the court to review, because I think these facts are different and unique, because there's not any drugs or drug paraphernalia at the location. I think that that's important. Well, he admitted that he used the apartment in his very profitable drug distribution system. He had a million and a quarter cash in the apartment and $250,000 of jewelry. Which he admits, I think, that that were proceeds of his business. He had another house that he lived in, and he had no other income except for a minor amount of income that he did for his father, carpentry or something. So all of that together to me shows that he admitted using the apartment in his drug dealings. So we don't know what that entailed. Maybe that shows an insufficient case by the government, but I'm not sure. But it's pretty indicative that he used the apartment for meetings or telephone calls or something in connection with his distribution. And I can agree that that could become a reasonable inference, but for the evidence in the record about the level and degree of surveillance that was done in this case, that there's nothing in the record or the PSR that ties the surveillance law enforcement did back to that apartment, there's a disconnect. And since there's no drug trafficking coming out of that apartment, they had his cell phone and they were up on a Title III wiretap that he was at the apartment while he negotiated drug deals. There's nothing in the record to support that it was used for the manufacturing and distribution of a controlled substance. I agree that he stored proceeds there, but for the enhancement to apply under the premises… Well, he admitted he used the apartment in his drug dealings, didn't he? Well, in drug trafficking activities, the enhancement to me is very specific that it has to be for the manufacturing and distribution of a controlled substance. And the cases suggest that there has to be controlled substances or paraphernalia in conjunction for that enhancement to apply. And we don't – and the record is lacking, and there's no evidence in the record to support that that was the location where he negotiated drug deals. Delivered drugs from, despite the level of surveillance that they had in this particular case. Now, I think if there was a phone call where he's located there negotiating a deal, I could agree with that premise that yes, that would be. But not under the facts that we have in this case. It's the insufficient evidence of phone calls, transactions from the apartment to support the enhancement. Was there any evidence of where he was storing the drugs? No. Well, that's what was odd to me. He was under such heavy surveillance, and he would always come from somewhere other than this apartment apparently with drugs. Why didn't they know where he was getting the drugs? I do not know. I mean, I think that's a point that stuck out to me, that with this level of surveillance, was there another house or location that he was picking up his source of supply or warehouse? I think that the lack of that information is critical to the evaluation of both enhancements. And I agree with you on that because that was interesting to me, that despite his level of surveillance, they couldn't pinpoint the location of where he was picking up from and delivering the cocaine. And so I think that is super important in the analysis of both enhancements in the case. You said they could not. I don't know if they couldn't, but did they? Was that question asked to them? It's not. Since this was a sentencing, it's not presented. Right. They didn't volunteer the information. Right. And the government didn't put out any evidence in sentencing to kind of shore that up and close that gap. And then my time is running out, but one thing I did want to touch on real quick is Judge Crone did say, even if I'm wrong, I still would have opposed the same sentence. We'd asked the court to look at the Ritchie case that we cited. In the Ritchie case, Judge Crone sentenced him within the guidelines that she calculated. In the Ritchie case, since the loss calculation was incorrect, just the blame and statement was insufficient to make it harmless, and therefore we'd ask the court to reverse the convictions and reverse the sentence in the enhancements. Thank you. You've saved time for rebuttal. Thank you, Mr. Whalen. Mr. Anderson? Good morning. As the court's aware, this is a case that involves the question, did the district court err in finding that the statutory offense characteristics, in this case 2D1.1 subsection B1 and 12, apply? The evidence in this case substantiates that Judge Crone did not err, and in fact she made a very prudent finding in finding they both apply. Let's take these both piecemeal. Let's start with the firearm. That firearm is in a closet. First of all, take a step back with regard to this apartment. This apartment is spartan living. I probably have more personal effects in my hotel room right now than are in this apartment. Master bedroom closet, large closet, suitcase on the floor, open, $1,000,000, $1,050,000. I did some calculations on my calculator as I was sitting here this morning. That's $10,500, $100 bills in one suitcase. You've got no garments belonging to anybody but him, and you only got a few shirts, a few pair of pants, and a gun case with a gun and a magazine in it. That is clearly—anybody looking at that set of facts would say that gun is clearly there in conjunction with those drug proceeds. Would you all agree that there's drug proceeds in that book? Anybody looking at this objectively would say that the two are tied. That was not a stretch in this case, and I don't think that that should be found to be an error. With regard to the drug premises argument in this case, the government completely disagrees that there's no evidence to substantiate that this condo that we're talking about was used as a drug premises in this case. When you look at the factual basis in this case, and starting— this would be in the docket from page 78 through 80, and I'm going to start at paragraph N and go through paragraph T. But what you have there—and this is within a 24-hour period. If you look at the dates on those paragraphs, when I dropped it, everyone knows it's dated. You have three transactions that are occurring with substantial amounts of cocaine, and Castro, the defendant in this case, has negotiated each one of those transactions. The first one he deals with is Roderick Smith. It started out to be 15 kilos of cocaine, moved to 14 kilos of cocaine, but then the transaction was effectuated, and we know it was effectuated because after the fact, they're talking back and forth about how there's four different cartel trademarks stamped on the various cocaine kilos in this case, and they thought that was interesting on the wire. Second transaction would have been with Sonny Williams. Two to three—originally it was supposed to be two kilos, but up to a three kilo of cocaine transaction, and those were—he was then—we know that was effectuated because after that was effectuated, law enforcement stopped him and confiscated the cocaine off of him. We were able to monitor and effectuate a small amount of transactions. Was that at the apartment? No, not at the apartment yet, but I will come back to that, I promise you, in just one second after I flush out the third of these transactions. Well, how close to the apartment was it? I don't know the answer to that, but the apartment is in downtown Houston. All of these transactions are occurring somewhere in the central Houston metropolitan area. I can't give you an exact what miles, though, as I stand here. But the third transaction, this one's interesting. This one was with Irvin Castillo, and that was originally supposed to be a four kilo transaction, but it became a two kilo transaction because there was no cocaine. Now you go back to the house. The reason why the search warrant is effectuated that day is because all these transactions are going on, and I'm going to dispute something that we said as defense counsel was speaking to you. He was inferring that with all the geolocation information we had in this case, there was no indication he was—that's simply not true. If you look in the docket, this is going to the detention hearing in this case, so I'm going to docket pages 163 through 164. Jason Haberman, who's the case agent in this case, says during the wiretap of Mr. Castro, he conducted three drug transactions in one day, and one of those drug transactions would be intercepted by law enforcement with three kilos of cocaine, which was delivered to a co-defendant in this investigation. Subsequent to that, we had identified a location in downtown Houston that he was using as an aside from his main residence where he currently lives, and we had identified that as a potential criminal location in furtherance of the crime, and a search warrant was drafted and executed in that location. How thorough did you search the remnants of drugs? Well, there's different types of drugs at premises. In the environment. One is the case—the one that we had in this case that would have been at 6219 Greyhooks, and that's what most people think of. That's the one where people are showing up night and day, and you can buy anything you want there, and it's operated by a criminal street gang. That is the first kind, and that's what people typically think of. This is a different kind. This unit that Rodney Castro has at 1475 Texas Avenue, Unit 402, different kind. This is the kind nobody knows about. This is the kind where I keep my money, I keep my narcotics. Now, I'm going to submit to the court the most logical finding is the reason why they don't find any narcotics there is because he's now out. He has done so many transactions that day. You would think you would find scales or packaging or something to indicate drugs had been there. But a kilo comes in a heavily wrapped kilo brick. You don't need—once you have a stack of—it's like a ream of printer paper. If I've got five reams of printer paper, I know I've got five reams. I don't have to weigh them or count the pages. I just assume that's what they are. That's how it works with kilos of cocaine. They come in bricks, and once you have five bricks, that's now your five kilos of cocaine. Once I break it down and I start transactioning ounces or smaller quantities, like at the first house I mentioned, that's when you're going to find scales and wrapping and all those kinds of things that we think about for street transactions. This is wholesale transactions that's going on at this unit. This is where he brings the product in from Mexico, and it sits to lead a front seat to Nepia Bird's stash house at 6219 Great Oaks. Well, do they have GPS data leading somewhere from the house to all these—y'all, he was surveilled for a long time. That's outside the record, but the answer is yes. Yes. Why isn't it in the record? Because that would have been in the original search warrant. The search warrant would have been the Houston search warrant, which is outside of our district. In hindsight, I wish it was, but that's not in our record. But what I am citing to you is in the record. The detention hearing is in the record, and there it discusses—later it discusses how they observed him that day, that day going to and from the stash house. That's in line 12 of page 164 in the document. He had been observed driving in and out of the parking garage at that location several times. Perhaps the question that he's talked about was what was the connection between him and the house where he found a million dollars. So he's obviously talking about our stash house here. This is the location where he was that day that he's doing the three transactions for 20-plus kilos of cocaine. This house was a drug premises. How many times was he seen driving in and out of the garage that day? The record says several times. What is your closest case, if you know of one, regarding the premises enhancement where there was, as Judge Richman discussed, absolutely no direct evidence of either drugs, drug residue, paraphernalia of any kind? I can cite you—one case would be directly on point, but it's a Fifth Circuit case. However, it is not published. It's persuasive only. That would be the Mazay case we just cited in New York. That was a case where he was—it was similar to this. He's a known drug trafficker, but when they do search war on his house, they don't find any more cops. They just find money. Similar to that, though, but mostly, I think the best case we have is the Fifth Circuit case, Moyen. Now, that goes to a different issue because that was a trial conviction, and at trial, he's convicted. Now, that's a reasonable doubt stamp. That's the highest standard there. And he's convicted on a 924-C, so that's possession of a firearm in furtherance of a drug conspiracy. And when he's found with it, you've got $200,000 in two boxes in a closet, and you have a third box in the closet with him that's got the firearm. That's almost exactly what we have here. But that's a transaction. You know, we're looking at the guidelines that says manufacturing or distributing. That's not—or in furtherance of a scheme to manufacture. Because in the Somalis factors, it says trafficking in narcotics or drug proceeds. So it's a little different. But it's a very similar fact pattern. What's the name of that case? That would be Moyen, in fact. One second. Oh, I'm sorry. No, that's all right. It is United States of America v. Armando Moyen, and it is 18-F-4-4-8.  I would also submit to the court this. The lifeblood of drug trafficking is money. Drug trafficking does not exist but for money. There's a reason in the Somali factors. So why didn't the guidelines say proceeds? That's money. Proceeds. It doesn't say manufacturing, distributing, or proceeds. It just says for the premises, for the purposes of manufacturing or distributing a controlled substance. I'm arguing an alternative now because I'm not backing down. I believe that the narcotics were there that day and he was out. I believe that's what the factual basis points to. But that said, I'm not— That's a lot closer. Can you draw a reasonable inference that there had been drugs there? Oh, absolutely, because there are several— Apart from that, I have a hard time finding that it fits within premises if there have never been drugs there. No, and I've got—there's basically two arguments. The first is, with the amount of cocaine he trafficked that day, and the fact that when you look at the Urban Castillo transaction, it never culminates in four. It goes down to two. He doesn't have any more cocaine is the most plausible explanation for that. And I believe that's why when we get to the house, there's no longer any cocaine there. I don't think that's a stretch at all. I think circumstantially that is what the situation was. However, I do also believe that just the amount of money that's there also shows that this was a premises that existed for the purpose of drug narcotics trafficking. What about phone calls? That's the other point. They say they—did they have GPS tracking data on where phone calls were made when he was actually arranging these drug transactions? Yes. Where does that show he was? At that point in time, he's all over it because he's in a vehicle meeting with these people. You never meet with them at your stop. You don't want anybody to know it's there. So he's out and about driving around and meeting with them. And then he goes back to this place periodically throughout that day, which is how the record reads at least at the detention level on page 164 of the docket. So there's never ever one location where—or twice where it was in the same spot where he was making the phone calls from to set up the deal? No, I believe he was probably making them on his cell phone in his car. Because law enforcement is surveilling— I'm just saying, is it a fact or not? Does the GPS data ever—where at least twice, two or three times, he was in the same spot? No, I don't believe he was. Is that correct? Other than the house, he would be in the house. I don't even know if he's making phone calls there. I have to look at the data. Well, that's kind of important to know, isn't it? Where he's making the phone calls, I don't know that that necessarily connects with where the narcotics are being stored. You're asking us to draw an inference one way but not the other. I'm just saying—I'm just trying to hear what the evidence is. Yes, I don't know that there's any evidence that he's making the phone calls from the apartment that day. Previous days, that would be true, but not that day. So he did make drug transaction calls from that apartment? I believe—memory search, I think it was in paragraph 15 of the search warrant, where they discussed—he made a call to Nike and Bird and then left from the stash house and brought narcotics to the Great Oaks stash house at that point in time. The one that Nike and Bird was from, the other stash house that he would supply. Finally, with regard to the district court's statement in this case, that Judge Pullman would have made the same finding in this case, irrespective of wherever the guidelines came out at based upon what the facts presented to her were, I don't think that that—I think that that's perfectly acceptable, Your Honors. Given the fact that you've got a million dollars in cash attributed to this individual, you've got all the multitude of transactions that he shows up at the Great Oaks location, where he is the principal supplier for that location, on the pool tables over there. So I don't think finding that he is at the top of the pyramid in this case and deserves the sentence he had is something that should eventually be overturned in this case. What do you do with the Ritchie case that Mr. Whalen cited? Well, I would say that based upon the evidence that was presented in sentencing and she had in a factual basis and in the PSR, there's ample evidence that she would have had before her to make the sentencing decision that she had made. I would just stand on that in this case. Thank you, Your Honors, and I appreciate the time. Thank you, Mr. Anderson. Mr. Whalen for rebuttal. Just briefly, I think what's important is what Judge Crum relied on to make these decisions. Mr. Anderson talked about what would maybe be in the search warrant or at the detention hearing, but that's not based on the record what Judge Crum relied on to reach her decisions about whether to apply the enhancements and what she stated on the record. So I think it's important that when we confine what Judge Crum relied on in the case that neither enhancements should have applied. And so I think that's important in the case. And I think whether or not they had GPS data, the only reference about GPS location data in the record is in the PSR at paragraph 16. There's no other evidence presented at the sentencing hearing presented to Judge Crum. Well, back to the enhancements themselves, are the search warrants in the record? I don't believe they are. I did not see the search warrants. No, they are not in the record. So we can't say that Judge Crum reviewed them or relied on them. Well, I'm just trying, again, not on the sentencing issue, but whether it was proper to impose that second enhancement. You're saying the search warrants were not in the record. That is correct. So is there any other GPS data in the record we can look at? Not that I see. The only GPS data, reference of GPS location data from this file was in paragraph 16 in the pre-sentence report, which is on page 278 of the record. What's our standard of review here? So we took the position on the standard of review that because the facts necessarily are not in dispute, what was in the record is that it is a de novo review because it's a typical legal conclusion of what the court under U.S. Zapata are. But I know the cases have distinguished Zapata, Laura, because the issue is whether or not he had ownership, and it wasn't clear whether or not he had ownership. In this case, we do have ownership. And so there are cases that say clear errors. We believe that it is de novo because, to me, it's a legal conclusion. She's applying the facts to the enhancement, and it's a legal conclusion that she made. But even if it is clear error, we believe we still prevail under either standard of review due to the lack of evidence in the record to support either enhancement. But there was an objection to both enhancements at the sentencing hearing. There were. There were. The two objections that were at the sentencing hearing was the firearm enhancement as well as the premises enhancement. And so those both were objected to. So under either standard, whether it's de novo or clear error, the evidence doesn't support the imposition of either enhancement. Thank you. Thank you, Mr. Whalen. Your case is under submission, and we notice that you're court-appointed. We wish to thank you for your willingness to take the appointment. You've done a good job as an officer of the court and on behalf of your client. Thank you.